[Civ. No. 9550. Fourth Dist., Div. One. Feb. 16, 1970.]

SAN DIEGO PROFESSIONAL ASSOCIATION,
Plaintiff and Appellant, v.
WILLIAM C. HERRICK, Defendant and Respondent.

## Counsel

Hillyer & Irwin, Oscar F. Irwin and Ronald R. Hrusoff for Plaintiff and Appellant.

Harelson, Enright, Levitt & Knutson and Jack R. Levitt for Defendant and Respondent.

## Opinion

**WHELAN, J.**—Plaintiff is a corporation that in January 1966 or earlier had entered into an agreement to lease from the owner Capital Services (Capital) a building to be constructed by Capital to house medical offices. The building would form a second unit (Unit Two) to an existing building

(Unit One) in which the officers of plaintiff, who were physicians, had their offices along with others, and in which the individuals who were officers and shareholders of plaintiffs also carried on a medical laboratory under the name Alvarado Medical Group (Alvarado) for their own use and as convenience for other tenants.

Defendant and Howard Ball (Ball) were physicians who, as partners, confined their practice to laboratory medicine. Some of their business came from doctors in Unit One and from the laboratory in Unit One. In 1965 there had been discussion with Dr. Roy Ouer (Ouer), then president of plaintiff and a member of Alvarado, looking toward the purchase by defendant and Ball of the laboratory facilities and practice of Alvarado. Those negotiations fell through.

With the projected construction of Unit Two presented to them, defendant and Ball on January 26, 1966 signed and delivered to plaintiff an offer to lease space in Unit Two for medical or dental offices. The offer contained these provisions: "All alterations, after approval of final plans for the building by tenant but before completion of the building, shall be at the expense of tenant and shall only be made with the approval of SAN DIEGO PROFESSIONAL ASSOCIATION.

". . . . . . . . . . . . . . . . . . .

"DURATION OF OFFER: This offer shall remain open until July 1, 1966, and shall be deemed accepted by SAN DIEGO PROFESSIONAL ASSOCIATION upon presentation to the tenant of a final form of lease for said office space to be mutually executed."

Before signing the offer to lease, defendant had had conversation with Ouer concerning possible competition in Unit One and Unit Two from physicians engaged full time in laboratory medicine, as distinguished from those who had a laboratory as an adjunct to practice in another field. Defendant understood there would be no such competition.

At the time of signing the offer construction of the Unit Two building had not commenced.

Ouer died in February 1966. Ball died on August 24, 1966.

In May 1966, Scales, a representative of Capital, made a demand upon defendant and Ball for $10,090.24 to cover the cost of including the special features desired by them in the space covered by the offer to lease, according to plans and specifications to meet defendant's requirements to be prepared by an architect not employed by defendant and Ball. Scales went over with defendant and Ball preliminary plans prepared by them and took them away with him. Defendant and Ball paid the demand by check

made payable in the manner requested by Capital and not in favor of plaintiff.

No form of lease was presented to defendant or Ball prior to July 1, 1966.

In August or September, defendant told Dr. Boyer, treasurer of plaintiff, he had learned full-time laboratory practice was being carried on in the quarters previously occupied by Alvarado by ABC Laboratory, an organization with several other branches. Defendant had heard of that development shortly after having given the check for $10,090.24; he later noted that referrals to his laboratory from Alvarado and the tenants of Unit One had fallen off. Boyer stated the arrangement was only temporary, on a month-to-month basis, and had come about when Alvarado lost its technologist.

After the conversation with Boyer, defendant, in August or September, talked with Dr. Hillenbrand, who also represented plaintiff. Dr. Hillenbrand was told by defendant "they" did not wish to go into Unit Two because of the presence of ABC Laboratory in Unit One. Hillenbrand was asked if "we" might get back the money advanced for the improvements, because plaintiff could probably sell the space to someone else. Dr. Hillenbrand said he could not answer that request without a meeting of the group interested in plaintiff. The next word defendant had was that the money could not be returned, that the improvements were part of the building and could not be removed, and that if defendant would sign the lease plaintiff would try to get someone else to take it over.

On November 6, 1966, plaintiff, through Dr. Stanford, its president, wrote and delivered a letter to defendant requesting him to execute a lease, the form of which was enclosed. Defendant took the lease form to Unit One where he saw Mr. Anderson, plaintiff's business manager, to whom he stated he refused to execute the lease. Before seeing Anderson, defendant walked through Unit Two and the space covered by the proposed lease and thought that space not to be completed for occupancy.

The officers and manager of plaintiff had not had anything to do with the making of the special improvements in that space, did not know who had done the work or prepared the plans, and had had nothing to do with supervising the work.

The officers and shareholders of Capital were not the same as those of plaintiff.

### CONTENTIONS ON APPEAL

Plaintiff's contentions on appeal may be paraphrased thus:

A. The evidence was such that as a matter of law the trial court should have found either:

(1) The offer to lease of January 26, 1966, was an enforceable agreement to lease because defendant (a) was estopped to deny the offer was not accepted; (b) was estopped to deny acceptance of the offer within the time limit mentioned was waived by defendant's putting up the money for the special improvements.

(2) The offer was in fact accepted by plaintiff's permitting the special improvements to be installed.

(3) Defendant went into occupancy of the premises by reason of having his special improvements installed and keeping them there, with the result the lease in the form submitted became effective without defendant's signature, since the taking possession was a part performance taking the matter out of the requirements of the statute of frauds.

B. The trial court erroneously adopted in its findings and conclusions the following contentions of defendant:

(1) That the offer to lease was revoked without its having been accepted.

(2) That there was no partial performance by either party to remove the offer to lease or the proposed lease from the statute of frauds.

(3) That the proposed lease contained provisions not contained in the offer or within the contemplation thereof or of the defendant in signing the offer.

(4) That plaintiff had an obligation to mitigate damages but made no attempt to do so.

(5) That defendant has never occupied nor taken possession of the premises.

(6) That the offer to lease was to be accepted by presentation to defendant of a final form of lease.

■ *Did the construction of the special improvements amount to an acceptance by plaintiff of the offer to lease?*

No. The advance by defendant of $10,000 to a third party and the construction by the third party of the special improvements are ambiguous as to their effect upon the relationship between plaintiff and defendant. No one testified as to the reason plaintiff did not submit the proposed lease before July 1; we discuss later a reason that is within the field of the reasonably probable. No one testified that the failure was because defendant had put up the $10,000; no one testified that act was considered a substitute for an affirmative acceptance by plaintiff. While plaintiff's non-action might have been explained by a belief that with defendant so firmly on the hook plaintiff could await events, no one testified to any such belief.

As against those unexplained ambiguities, the language of the offer is clear and definite as to the manner of acceptance. The court's findings that there was no acceptance is supported by the evidence.

Nor need we overlook the possibility that if defendant had not earlier declared his intention not to execute a lease, the proposed lease presented him might have been different as to the rent to be paid. While the form of the proposed lease appears to have been prepared for all tenants of the plaintiff, the amount of rent per square foot had originally been left a blank, occupied in this case with the amount called for by the offer to lease.

Plaintiff asserts the method of acceptance prescribed by the offer to lease was not exclusive, citing *Estate of Crossman,* 231 Cal.App.2d 370 [41 Cal. Rptr. 800], as authority for the proposition that an acceptance of an offer may be communicated other than in the manner prescribed in the offer. In *Estate of Crossman, supra,* an optionee who had exercised an option by a letter sent timely by ordinary mail sought to repudiate it because he contended unsuccessfully it should have been sent by registered mail under the terms of the option. The case has no parallel to the case at bench.

Plaintiff cites also *McAulay* v. *Jones,* 110 Cal.App.2d 302 [242 P.2d 650], in which a lessee sent a notice of intention to renew a lease which provided that if such notice were sent lessor should within 90 days notify lessee in writing whether lessor would accept or reject the offer. Lessor did neither. In such circumstance the lessee's notice was held to be effective to renew.

In the present case plaintiff did not undertake to give notice of acceptance or rejection of the offer, or to do anything at all. The cited case has no value as precedent here, where it is the inactive party who seeks to make his own negative a positive.

After the expiration of the period for acceptance of the lease, the only conversations between defendant and any of the persons representing plaintiff seem to have been with regard to defendant's inquiries concerning the presence of ABC Laboratories in Unit One, his declarations of intention not to enter into a lease and his request the $10,000 might be refunded.

The trial court made no finding that the existence of the competing laboratory conflicted with any agreement or representation or that it affected the rights of the parties.

It does tend to explain why defendant, if the offer to lease had not been accepted, was not inclined to excuse the lack of acceptance in the manner prescribed.

■ *Did defendant take possession of the premises?*

No. When we speak of taking possession, we speak of taking possession from the landlord. Plaintiff was not in possession when the improvements were installed, and did not pretend to have taken possession of the building until November or December. The lease to plaintiff from the owner was not made until the building was completed. Whether the owner of the property was also the building contractor, the latter was the person who had right to possession and had possession during the construction period, in the absence of any evidence to the contrary. (*Gray* v. *Bekins,* 186 Cal. 389, 395 [199 P. 767].)

Plaintiff has assumed and states the parties treated the lease as in existence at all times after the offer was made. Defendant is said to have induced a belief that such was the case by putting up the money for the improvements. No one testified to that effect; such evidence as there is is to the contrary. The proposed lease itself, bearing a date of November 1, 1966, contains the following: "The term of this lease shall be for ten (10) years, commencing on the date the leased premises are completed and ready for occupancy. Lessor shall give Lessee at least thirty (30) days' written notice prior to the date of commencement of the term of this lease.

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Lessor agrees to obtain completion of construction of the building by December 1st, 1966, so that the same shall be ready for occupancy by the Lessee. . . . The building shall be deemed ready for occupancy on the date that a notice of completion thereof is recorded.

"If for any reason the term of this lease shall not have commenced on or before December 1st, 1966, this lease is automatically and ipso facto terminated and no longer shall be of any force or effect."

The offer to lease provided: "The term of the lease shall be ten (10) years from the notification date that the building is ready for tenancy."

The testimony of the business manager of plaintiff at the time of trial described the space in question as being an unleased portion of the building, and that the first occupancy of any part of Unit Two was effectuated about November 6. Elsewhere he stated the special improvements were completed approximately November or December 1.

All of this is referred to only as it relates to the question whether conduct of the parties evidenced their recognition of the offer to lease as a binding agreement to lease, which required nothing more to be fully effective without the execution of any other document. It may reasonably be inferred that such was not the case.

■ *Did the offer to lease become the contract of the parties?*

No. It is at once apparent that plaintiff intended to leave open for some period of time acceptance of the offer to lease. When the offer was made the construction had not started; it may have been contemplated by plaintiff that construction would be substantially completed by July 1; it may have been that the total cost of construction would not be determined until the completion of the building was in sight and that the rental to be paid by plaintiff to the owner would only then be determined and only then would plaintiff decide whether to accept the offer at the rent originally contemplated.

Nothing was said in evidence as to which party produced the form of the offer. The trial judge might have inferred reasonably that the form was prepared by or for plaintiff and that the acceptance deadline and the manner of acceptance were fixed by plaintiff.

*At what point in time could it be said, then, that the offer to lease was accepted?*

Plaintiff states the proposition that it accepted defendant's offer by allowing him to take possession and make substantial alterations.

We have discussed elsewhere our reasons for holding that defendant did not take possession and that plaintiff cannot be said to have allowed him to take possession.

■ Plaintiff did no act to indicate an acceptance, unless it was to inform Capital of the offer to lease as the result of which Capital approached defendant and Ball, learned what they had in mind with regard to improvements, and made its arrangements with them as to cost thereof. Plaintiff, however, was not a party to those negotiations, and in view of the fact it became the lessee of Capital it may be assumed in the absence of all other evidence on the subject that in taking the lease from Capital with the improvements in place, plaintiff, with knowledge of defendant's declared intention not to occupy the space, had opportunity to bargain with Capital concerning the matter.

Plaintiff has not produced any evidence as to the terms of its lease with Capital or whether it has in fact suffered any damage by reason of defendant's having put up the $10,000.

■ Payment of that money by defendant may be considered evidence of his good faith adherence at the time to the intent of the offer to lease, and need not be twisted into a waiver of an essential term of the offer. This might, perhaps, constitute consideration for not withdrawing the offer before accept-

ance within its terms. Very clearly it would be a powerful motive for defendant not to withdraw the offer before acceptance.

*Did the proposed lease contain terms not contemplated by the offer to lease?*

Yes. Most of the provisions not included in the written offer are of a character often found in long-term leases of professional draftsmanship. Two of them are not: one numbered 30, captioned "Representations for Benefit of Encumbranceholder," the other, numbered 32, captioned "Attornment."

Each of those might be found objectionable by a tenant.

By paragraph 13, the lessee is required to "pay all taxes that may be assessed to the premises by reason of any alterations, improvements or additions made thereon by the Lessee." The offer recited that the lessor would pay all real property taxes and that the lessee would pay only personal property taxes.

That might be a source of controversy in view of defendant's having put up the $10,000 for improvements.

The offer to lease called only for payment of monthly rent in advance; the proposed lease, for payment of the last month's rent in advance as well.

The proposed lease contained a provision for attorney's fees not found in the offer. While that is not an unusual provision, plaintiff's reliance on it in praying for an allowance of attorney's fees is inconsistent with any claim other than that the proposed lease itself has become the final contract of the parties, rather than the offer to lease.

It is true, as argued by plaintiff, that defendant's refusal to sign the lease was not predicated upon any objection to a particular clause. The trial court's finding, however, is not inappropriate because plaintiff's complaint has based its claim of acceptance of the offer to lease on its tender of the proposed lease and has based its second cause of action upon an alleged failure to perform the terms of the proposed lease.

It is also stated by plaintiff that defendant knew what terms would be in the lease when he signed the offer. That is because he had had presented him a form of lease on Alvarado's laboratory in Unit One at the time negotiations were being discussed for the sale of the laboratory facilities to him in 1965. The form of that lease was offered in evidence and objection to it sustained. That ruling is assigned as error.

On that score it may be said that whether that form of lease did or did not contain provisions that might "be deemed appropriate," it was a document

that was in existence when the offer was made, and if its covenants were to be the covenants in the proposed lease to be executed as an acceptance of the offer, that might have been stated in the offer. It is purely argumentative to say that because defendant had had the opportunity to become acquainted in 1965 with the terms of that form of lease he made his offer to lease with those terms in contemplation. There was no error in the court's ruling.

Plaintiff's complaint alleged only the offer and its acceptance. It argued in the lower court and argues here that there was an offer and acceptance; it argued also that the offer as accepted constituted not only an agreement to lease that has merged in the execution of the lease form submitted in November, but is itself a lease. Plaintiff has not yet elected upon which of those inconsistent theories it relies.

We are of opinion that neither has been sustained.

On appeal plaintiff contends for conclusions that could be reached only by reliance upon estoppel or waiver, neither of which was pleaded.

We have concluded that the elements of neither estoppel nor waiver have been proved.

The findings of the court that the offer to lease was not accepted, that there was no part performance of the terms of the lease, and that the offer was revoked without having been accepted, sufficiently sustain the judgment.

It becomes unnecessary to consider whether plaintiff had an obligation to attempt to mitigate damages, and the effect of the inclusion in the proposed lease of provisions not contemplated by the offer.

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.